UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GAIL R. PAPP,                                          :

             Plaintiff,                    :

            -against-                          :

COMMISSIONER OF SOCIAL SECURITY,      :

            Defendant.                   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

05 Civ. 5695 (AJP)

**OPINION AND ORDER**

**ANDREW J. PECK, United States Magistrate Judge:**

       Plaintiff Gail Papp, represented by counsel, brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") to deny Papp disability insurance benefits. (Dkt. No. 1: Complaint.)  The Commissioner has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dkt. No. 11: Comm'r Notice of Motion), and plaintiff Papp has cross-moved for judgment on the pleadings (Dkt. No. 13: Papp Notice of Cross-Motion).  The parties have consented to decision by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 8-9.)

       For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is GRANTED, and plaintiff's motion for judgment on the pleadings is DENIED.

## FACTS

### Procedural Background

On March 29, 2002, plaintiff Gail Papp applied for disability insurance benefits claiming that she became unable to work because of a disabling condition on August 31, 1996. (See Dkt. No. 12: Administrative Record filed by the Commissioner ("R.") at 51-53.) Papp's application was denied initially on May 10, 2002 (R. 25-30), and Papp requested a hearing before an Administrative Law Judge ("ALJ") (R. 31). The ALJ held a hearing on December 2, 2003, at which Papp appeared with counsel and testified. (R. 155-80.) At the hearing, Papp and her counsel amended her disability onset date to January 1, 2001. (R. 164-65; see also R. 34, R. 54.) It is also undisputed that Papp's "Date Last Insured" for benefits is June 30, 2001. (See R. 151; see pages 3, 14 below.) On January 30, 2004, the ALJ issued her decision, finding that Papp was not disabled. (R. 12-24.) The ALJ's decision became the final decision when the Appeals Council denied Papp's request for review on June 3, 2005. (R. 4-6.)

The issue before the Court is whether the Commissioner's decision that Papp was not disabled is supported by substantial evidence. The Court finds that it was.

### The Hearing Before the ALJ and Other Non-Medical Evidence in the Record

Papp, a high school graduate, was born on December 12, 1946, and was fifty-four years old on June 30, 2001, the date that her insured status expired. (R. 51, 69, 80, 159.) From 1964 to 1994, Papp worked in the installation department at Verizon. (R. 75, 161-62.) For the last twenty years that Papp worked at Verizon, she was the manager of the installation department, which involved supervising a staff of ten people. (R. 161-63.) Physically, Papp spent about half the time

on her feet and half the time sitting at the Verizon job.  (R. 163.)  Papp did not do any significant

lifting or carrying on that job.  (R. 163.)  In 1994, Verizon underwent a corporate downsizing, during

which Papp accepted a pension package and retired.  (R. 52, 159, 164.)

Following her retirement, Papp worked part-time as a file clerk and receptionist at

a doctor's office near her home for approximately nine months during 1995 to 1996.  (R. 64, 165-66.)

She worked approximately three days a week, seven hours each day, at this job.  (R. 64, 165-66.)

Papp stopped working at this job because her hours were cut to only one day a week and she was

finding the job "difficult."  (R. 167.)

During 1996, Papp worked full-time as a receptionist for Allstate Insurance for

approximately three months.  (R. 167-68.)  Papp left this position because she could not handle its

requirements, stating that "I thought I could handle it, but I couldn't . . . there were days that I

couldn't get out of the bed.  I was so sick."  (R. 168.)

During 1997-2000, Papp worked one day a week as a receptionist at the Wave Hill

Museum.  (R. 52, 161.)

For all her jobs, Papp said it was an effort to get up and dressed and try to push herself

to do the job; and while she tried to do her best, sometimes she made mistakes.  (R. 177.)  Despite

her medical treatment, she feels "worse" now than before – she "just want[s] to stay in bed."  (R.

177-78.)  Since the beginning of 2001, except for going to the doctor and buying groceries, she does

not often leave her home.  (R. 178.)

Papp's counsel conceded that Papp's date last insured was June 2001.  (R. 169-70.)

Papp first started seeing her current psychiatrist in October 2000. (R. 168.) This was the first time that Papp had ever received mental health care. (Id.) At the time of the ALJ hearing on December 2, 2003, Papp regularly took a combination of antidepressant medications, including Lithium, Zoloft and Zyprexa, as well as Lipitor to lower cholesterol. (R. 170-71.) Papp weighed 183 pounds, having gained approximately forty-three pounds on her 5'1-1/2" frame as a result of taking the Zyprexa, but did not have any other side effects from taking those medications. (R. 171-72.) Papp said that she felt "a little better" when taking her medications but approximately three days a week she could not leave the house because of her symptoms. (R. 172-74.) On an "average" or "typical" day, Papp "might watch TV or read a book." (R. 174.) Papp does not see friends or family frequently, but does talk to them on the telephone. (R. 175.) Papp takes care of her own household, does her own cooking and cleaning, and bathes herself every day. (R. 175-76.)

Papp's attorney agreed that the ALJ had all the medical records needed. (R. 158.)[1]

**Medical Evidence Prior to Papp's Alleged Onset of Disability (January 1, 2001)**

Dr. Philip F. Saltiel, a licensed psychiatrist, began treating Papp upon referral from her internist (Dr. Lebowitz) on October 27, 2000.[2] (R. 124.) Papp visited Dr. Saltiel for treatment monthly. (Id.) During a visit on November 21, 2000, Papp stated that she first saw a doctor for depression approximately six years earlier, who had prescribed Zoloft. (R. 113.) Papp complained

---

[1]     It appears that a Dr. Salzman had treated Papp prior to 2001 but that when contacted by the Social Security Administration, Dr. Salzman reported that "he has no records, no clinic notes and will not be able to make any statement concerning that time period." (R. 83.)

[2]     In a letter dated August 2, 2002, Dr. Saltiel indicated that he started treating Papp on November 21, 2000. (See R. 106.)

to Dr. Saltiel on November 21, 2000 that she felt very depressed, that she just wanted to lay in bed, that she had poor sleep, loss of 30 pounds due to loss of appetite, anhedonia, morbid thoughts, hopelessness, poor concentration, and frequent crying. (<u>Id</u>.) She stated that she was single, lived with her elderly aunt, had no siblings or other family, and was receiving a pension of $1,900 per month. (<u>Id</u>.) She reported having suicidal ideation, but had never attempted suicide. (<u>Id</u>.) Papp had experienced hypomanic spending in 1999 and stated that she had "last felt well in 4/00." (<u>Id</u>.) Dr. Saltiel indicated that Papp was dysphoric, his impression was "Bipolar II," and he prescribed the medications Zoloft, lithium, Zyprexa, and Klonopin. (<u>Id</u>.)

On December 6, 2000, Papp visited Dr. Saltiel and stated that she was still depressed and anxious. (R. 114.) Dr. Saltiel noted that Papp experienced decreased self-esteem. (<u>Id</u>.) Dr. Saltiel increased the dosages of lithium, Zoloft and Zyprexa. (<u>Id</u>.) On December 28, 2000, Dr. Saltiel noted that Papp was "doing well" and "tolerating" her medications. (<u>Id</u>.) Dr. Saltiel continued her medications and supportive treatment. (<u>Id</u>.)

**Medical Evidence After Papp's Alleged Onset of Disability and Before the Expiration of Her Insured Status (January 1, 2001 - June 30, 2001)**

Dr. Saltiel continued to observe that Papp was "doing well" during visits on March 1, 2001 and April 19, 2001. (R. 114.) Papp received supportive therapy and was advised to continue her medications. (<u>Id</u>.)

**Medical Evidence After the Expiration of Papp's Insured Status on June 30, 2001**

On July 23, 2001, Dr. Saltiel indicated that Papp's mood was "OK." (R. 115.) Papp reported weight gain, and Dr. Saltiel decreased her dose of Zyprexa. (Id.) Papp also started taking Synthroid. (Id.)

On September 19, 2001, Papp told Dr. Saltiel that she was more depressed and had continued to gain weight. (Id.) She also told Dr. Saltiel that she was grieving over her aunt's death. (Id.) Dr. Saltiel discontinued Papp's prescription for Zyprexa, and advised her to take Geodon if she became more dysphoric. (Id.) On September 24, 2001, Dr. Saltiel increased Papp's lithium dosage. (Id.)

On October 31, 2001, Papp complained that she was feeling "low," but said that she was tolerating Geodon. (Id.) Dr. Saltiel checked her lithium level and increased the level of Geodon. (Id.)

On December 19, 2001, Papp did not report any new issues. (Id.) Dr. Saltiel again increased Geodon and continued Papp's other medications. (Id.)

On January 20, 2002, Papp complained of increased depression because it was her deceased aunt's birthday and because she had received an eviction notice. (R. 116.) Dr. Saltiel indicated that Papp was "functioning" and continued her medications. (Id.) On March 6, 2002, Papp complained that she was depressed because of "home issues." (Id.) Dr. Saltiel increased her dosages of lithium and Geodon. (Id.) On April 10, 2002, Dr. Saltiel noted that Papp was "stable" and continued her medications. (Id.) On May 29, 2002, Dr. Saltiel indicated that Papp seemed

"depressed" due to her family moving out. (Id.) Dr. Saltiel increased Papp's lithium dosage and Zoloft dosages and prescribed Ambien, a sleep aid. (Id.)

On June 28, 2002, Dr. Saltiel noted that Papp had tremors and seemed very depressed and withdrawn. (R. 117.) Dr. Saltiel discontinued Geodon, restarted Zyprexa, and decreased Zoloft and lithium. (Id.)

On July 15, 2002, Dr. Saltiel completed a Psychiatric/Psychological Impairment Questionnaire that he indicated applied to Papp's present condition. (R. 98-105.) Dr. Saltiel gave a "fair" prognosis, stating that Papp's "[l]ack of support[] would suggest slow recovery." (R. 98.) Dr. Saltiel diagnosed: Axis I - bipolar, depressed; Axis II - dependent traits; Axis III - none; Axis IV - mild chronic illnesses, no social support; Axis V - current 55/75; highest GAF over the past year - 75.[3/] (R. 98.) Clinical findings included mood disturbance, emotional lability, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, feelings of guilt or worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, generalized persistent anxiety, and pathological dependence or passivity. (R. 99.)

---

[3/]     "The DSM-IV multiaxial scale assesses an individual's mental and physical condition on five axes, each of which refers to a different class of information. Axis I refers to clinical disorders; Axis II refers to developmental and personality disorders; Axis III refers to general medical conditions; Axis IV refers to psychosocial and environmental problems; and Axis V cites the individual's global assessment of functioning ('GAF'). A GAF of 55 represents moderate symptoms that present a moderate difficulty in social, occupational or school functioning. A GAF rating of 70 to 80 represents only transient symptoms that are considered expected reactions to psycho-social stressors." (Dkt. No 12: Comm'r Br. at 8 n.5, citing American Psychiatric Association's Diagnostic and Statistical Manual Of Mental Disorders 27, 34 (4th ed. Text Revision 2000), citations omitted.)

Papp's "primary symptoms" were "labile mood, depressed mood, [feelings of] worthlessness, excessive dependence, lack of motivation, [and] severe anxiety."  (R. 100.)

Dr. Saltiel reported that Papp was "mildly limited," meaning that her condition "does not significantly affect the individual's ability to perform the activity," in the following activities: the ability to remember locations and work-like procedures; the ability to understand and remember one or two step instructions; the ability to carry out simple one or two-step instructions; the ability to interact appropriately with the general public; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; and the ability to travel to unfamiliar places or use public transportation.  (R. 100-03.) Dr. Saltiel reported that Papp was "moderately limited," meaning that her condition "significantly affects but does not totally preclude the individual's ability to perform the activity," in the following activities: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; the ability to work in coordination with or proximity to others without being distracted by them; the ability to make simple work related decisions; the ability to ask simple questions or request assistance; the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to set realistic goals or make plans independently.  (Id.)

Dr. Saltiel reported that Papp was "markedly limited," meaning that her condition "effectively precludes the individual from performing the activity in a meaningful manner," in the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. 100-02.) Dr. Saltiel reported that Papp had no evidence of limitation in her ability to sustain an ordinary routine without supervision. (R. 101.)

Dr. Saltiel opined that Papp did not experience episodes of deterioration or decompensation in work or work like settings that caused her to withdraw and/or experience exacerbations of signs and symptoms, because she was "too anxious and passive to engage in such situations." (R. 103.) Papp's medications included Lithium, Klonopin, and Zoloft. (Id.) Dr. Saltiel indicated that Papp's impairments were expected to be ongoing for twelve months or more, and that she was capable of low work stress levels. (R. 104.) Dr. Saltiel noted that Papp's impairments were likely to produce "good days" and "bad days." (Id.) Dr. Saltiel estimated that Papp would be absent from work, on average, more than three times a month as a result of her impairments or treatment. (R. 105.) In response to Question 21, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?," Dr. Saltiel answered: "Presently." (R. 105.)

On August 2, 2002, Dr. Saltiel saw Papp and noted that Papp's mood had increased and that she was tolerating her medications. (Id.) Dr. Saltiel prescribed Provigil and recommended ongoing supportive therapy. (Id.)

On August 2, 2002, Dr. Saltiel also completed a narrative report on Papp's condition. (R. 106-07.) Dr. Saltiel reported that Papp was referred to him by her primary care physician, Dr. Lebowitz, "for evaluation of a six-year history of bipolar disorder." (R. 106.) Dr. Saltiel's narrative report noted that Papp's first psychiatric contact was in 1994 and that she had a long history of feeling very depressed. (Id.) Dr. Saltiel noted that Papp's symptoms included "severely depressed mood, severe anxiety, severe lethargy, finding all tasks difficult, difficulty sleeping, loss of weight with poor appetite, and difficulty enjoying anything." (Id.) Papp also had occasional morbid thoughts, felt hopeless, cried frequently, and had poor concentration. (Id.) Dr. Saltiel stated that Papp's depression worsened in 1997 after she had a hysterectomy. (Id.)

Dr. Saltiel reported that when Papp came to see him in November 2000, she was taking lithium, Zoloft and Klonopin, which was prescribed after an "episode of mania in 1999 . . . characterized by impulsive spending, practically depleting her savings." (Id.) Papp "has not had a manic episode since then." (Id.)

Dr. Saltiel reported that Papp "has had episodes of severe depression in the past two years, but generally had been maintained at a dysthymic level." (Id.) Dr. Saltiel noted that Papp was usually "bored, lethargic and not motivated to branch out and pursue other interests or tasks." (Id.) Papp's concentration was "quite impaired" and she had a "hard time following directions, mostly due to anxiety." (Id.) Dr. Saltiel reported that Papp was "unable to handle the stress of looking for work" and that during the periods of depression work would be "nearly impossible" for her. (R. 106-07.) Dr. Saltiel expressed the hope that Papp would improve within twelve to twenty-four months and

could resume working. (R. 107.) Dr. Saltiel noted that Papp was compliant with her medications and visits to him on a monthly basis. (Id.)

On September 5, 2002, Papp complained of increased depression because her family was moving out and she was "anxious about being alone." (R. 117.) Papp had stopped taking Provigil because of an upset stomach. (Id.) Dr. Saltiel continued Zoloft, Zyprexa and lithium, and started Seroquel. (Id.) On October 11, 2002, Dr. Saltiel noted that Papp was improving, and he continued Zoloft, Zyprexa, Seroquel and lithium and started Lexapro. (Id.)

On November 25, 2002, Papp complained of increased depression secondary to the stresses of family in home, decreased money, and her disability hearing. (R. 118.) Dr. Saltiel discontinued Zyprexa and continued Seroquel, Provigil, Zoloft, Lexapro, lithium, and Klonopin. (Id.)

On January 8, 2003, Papp reported increased depression, and her medications were continued (Id.) On January 21, 2003, Papp complained of tiredness and agitation, and Dr. Saltiel discontinued Lexapro. (R. 121.) On February 26, 2002, Dr. Saltiel noted that Papp "seem[ed] stable," but was "still depressed" and "lack[ed] structure." (R. 122.) He continued her medications. (Id.)

On June 25, 2003, Dr. Saltiel completed another Psychiatric/Psychological Impairment Questionnaire, noting that the opinions and descriptions of Papp's sumptoms referred to her condition "now." (R. 124-31.) Dr. Saltiel diagnosed: Axis I - bipolar, mixed; Axis II - none; Axis III - none; Axis IV - mild-poor social support, chronic illness; and Axis V - current GAF 60/80 with the highest GAF of 80 over the past year. (R. 124.) Dr. Saltiel gave a "fair" prognosis due to

"too many depressive episodes, not effectively controlled by meds." (Id.) Dr. Saltiel essentially repeated his earlier opinions from his July 15, 2002 questionnaire regarding Papp's symptoms, clinical findings, and restrictions of abilities. (R. 98-105, 125-31.) Dr. Saltiel reported that Papp was markedly limited in her ability to carry out detailed instructions and her ability to accept instructions and respond appropriately to criticism from supervisors, and was either moderately limited or mildly limited in the same abilities as in the last report. (R. 98-105, 127-31.)

On November 21, 2003, Dr. Saltiel noted that his assessment dated June 25, 2003 "remain[ed] valid" and that Papp "continue[d] to be disabled." (R. 137.)

On January 14, 2003, Dr. Arthur Lebowitz, Papp's general physician since 1990, wrote a letter "To Whom It May Concern." (R. 109.) Dr. Lebowitz stated that "[d]uring these past 12 years, [Papp's] primary and recurring problem has been severe depression." (Id.) Dr. Lebowitz concluded that "[i]n my opinion her disability is psychiatric and is chronic and severe. I refer you to detailed supporting data from her psychiatrists." (Id.)

**Medical Evidence Submitted to the Appeals Council**

On October 25, 2004, Dr. Azariah Eshkenazi performed a consultative evaluation of Papp on behalf of her counsel. (R. 139-41.) "The purpose of [the] evaluation was to determine Gail Papp's mental status, at present, in order to ascertain her ability to be gainfully employed." (R. 139.) Dr. Eshkenazi reported that Papp cried throughout the examination and presented an appearance of severe depression. (R. 139-40.) Papp stated that it was a major problem to sleep well, although she stayed in bed most of the day and night. (R. 140.) Papp's hands shook constantly throughout the evaluation and described that she had no energy to do anything and felt like life was over for her.

(Id.)  Papp stated that she had no appetite but has gained a lot of weight as a result of the medication and hypothyroidism condition from which she suffers.  (Id.)

Dr. Eshkenasi reported that Papp's speech was coherent and that her thought processes can be productive, although she has a great deal of difficulty concentrating.  (Id.)  Papp's memory was fair, her affect was labile, and her mood was one of severe depression.  (Id.)  Papp denied active suicidal ideation.  (Id.)  Dr. Eshkenazi reported that there was no evidence of psychosis such as visual or auditory hallucinations, and that Papp's judgment and insight were fair.  (Id.)

Dr. Eshkenazi's psychiatric diagnosis was Axis I - bipolar disorder - severely depressed, at present; Axis II - dependent personality disorder; Axis III - hypothyroidism; Axis IV - life circumstance problem; Axis V - 55 to 60.  (R. 141.)  Dr. Eshkenazi opined that Papp was "not able to be gainfully employed," and noted that "[c]onsidering the fact that her severe condition has lasted for over five years now, I doubt that it is going to improve in the foreseeable future."  (Id.)

Dr. Eshkenazi also prepared a Psychiatric/Psychological Impairment Questionnaire in which she noted that her opinion of plaintiff's functioning applied to the period beginning in 1999.  (R. 142-49.)  Dr. Eskenazi opined that Papp was markedly limited in:  her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; her ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; her ability to interact appropriately with the general public; her ability to accept instructions and respond appropriately to

criticism from supervisors; her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and her ability to respond appropriately to changes in the work setting. (R. 145-46.) Papp's medications included lithium, Zoloft, Klonopin and Seroquel. (R. 147.) Dr. Eshkenazi opined that Papp was "incapable of even 'low stress'" work, and estimated that Papp would be absent from work, on the average, more than three times a month as a result of her impairments or treatment. (R. 148-49.) In response to Question 21, "In your best medical opinion, what is the earliest date that the description of symptoms and limitations in this questionnaire applies?," Dr. Eshkenazi answered, "1999." (R. 149.)

**The ALJ's Decision**

The ALJ denied Papp's application for disability insurance benefits in a written decision dated January 30, 2004. (R. 12-24.) The ALJ determined that "[i]nformation contained in Ms. Papp's earnings record reveals that she has acquired sufficient quarters of coverage to remain insured only through June 30, 2001. Accordingly, the claimant must demonstrate that she was under a disability on and before the date her insured status expired." (R. 15-16; see R. 151.)

The ALJ applied the appropriate five step legal standard and reviewed all exhibits in the record, including all medical evidence, as well as the hearing testimony and the arguments presented. (R. 16-24.) At the first step, the ALJ found that Papp had not engaged in substantial gainful activity since January 1, 2001, the claimed onset date of Papp's alleged disability. (R. 16-17, 23.) At the second step, the ALJ found that Papp's bipolar disorder was a "severe" impairment based upon the requirements of 20 C.F.R. § 404.1520(c). (R. 23; see also R. 17.) At the third step, the ALJ found that Papp's medically determinable impairment did not meet or medically equal one of

the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (R. 17, 23.) At the fourth step, the ALJ found that Papp had "the residual functional capacity to understand, carry out, and remember simple instructions, respond appropriately to supervision, co-workers, and usual work situations, and deal with changes in a routine work setting, which are the mental requirements of unskilled work." (R. 23.) Additionally, the ALJ noted that Papp's "unskilled past relevant work as a receptionist/file clerk did not require the performance of work-related activities precluded by her residual functional capacity," and concluded that Papp's "medically determinable bipolar disorder does not prevent the claimant from performing her past relevant work as a receptionist/file clerk." (Id.) The ALJ also found in the alternative that "considering the claimant's age, education, past relevant work experience, that the claimant can perform work-related activities at the exertionally heavy level, and that her non-exertional mental limitations do not significantly diminish the claimant's unskilled vocational job base, a finding that the claimant is not disabled is reached based upon the framework of the Medical-Vocational Guidelines, Section 204.00." (R. 24.) The ALJ ultimately found that Papp had not been under a "disability," as defined in the Social Security Act, since January 1, 2001, and was not entitled to a period of disability insurance benefits under Sections 216(i) or 223 of the Social Security Act. (Id.)

The ALJ carefully reviewed Papp's hearing testimony and the medical records and reports from Dr. Saltiel. (R. 17-22.) The ALJ noted that Dr. Saltiel first treated Papp in October or November 2000. (R. 17-18.) While Papp reported a six year history of bipolar disorder to Dr. Saltiel, it appeared that she only had two major episodes, in 1997 after a hysterectomy and in 1999, but responded to medication and has not had a manic episode thereafter. (R. 18.) From late

2000 to April 2002, Papp "was generally maintained at a dysthymic level" but with "episodes of severe depression." (R. 18.) Based on "discrepancies between [Papp's] assertions and information contained in the documentary reports, . . . there are enough inconsistencies that render the claim suspect, and clearly fails to establish convincing evidence that [Papp] is totally disabled. Accordingly, the [ALJ] conclude[d] that [Papp's] statements concerning her impairment and its impact on her ability to work are not entirely supported by the record." (R. 19.)

The ALJ gave "no weight" to Dr. Lebowitz's opinion. (R. 20.) The ALJ noted "that there is no evidence in the record that Dr. Lebowitz referred [Papp] to any mental health professional until November 2000 in spite of his opinion that the claimant has had a chronic and severe psychiatric condition for 12 years." (R. 20.)

The ALJ also found that "Dr. Saltiel's treatment notes are inconsistent with his reported clinical findings (symptoms) and his assessment of [Papp's] ability to function in such areas as understanding and memory, concentration and persistence, social interaction, and adaptability. . . . Accordingly, the [ALJ gave] little weight to the opinion by Dr. Saltiel in November 2003 that [Papp] is disabled because it is contrary to his reports and clinical notes." (R. 20-22.)

The ALJ concluded that Papp's past relevant work was as a receptionist/file clerk; that work "did not require the performance of work activities precluded by her medically determinable impairment"; and thus Papp "retains the residual functional capacity to return to past work" and is not disabled. (R. 22.)

<u>**ANALYSIS**</u>

**I.**     <u>**THE APPLICABLE LAW**</u>[4/]

    **A.**     <u>**Definition of Disability**</u>

        A person is considered disabled for Social Security benefits purposes when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); <u>see, e.g.</u>, Barnhart v. <u>Thomas</u>, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002);[5/]

---

[4/]    For additional decisions by this Judge discussing, <u>inter alia</u>, the standard of review in Social Security cases in language substantially similar to that in this entire section of this Report and Recommendation, <u>see, e.g.</u>, Feliciano v. <u>Barnhart</u>, 04 Civ. 9554, 2005 WL 1693835 at *6-9 (S.D.N.Y. July 21, 2005) (Peck, M.J.); <u>Rodriguez</u> v. <u>Barnhart</u>, 04 Civ. 4514, 2005 WL 643190 at *5-8 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); <u>Jiang</u> v. <u>Barnhart</u>, 03 Civ. 0077, 2003 WL 21526937 at *6-10 (S.D.N.Y. July 8, 2003) (Peck, M.J.), <u>report & rec. adopted</u>, 2003 WL 21755932 (S.D.N.Y. July 30, 2003) (Kaplan, D.J.); <u>De Roman</u> v. <u>Barnhart</u>, 03 Civ. 0075, 2003 WL 21511160 at *6-10 (S.D.N.Y. July 2, 2003) (Peck, M.J.); <u>Acosta</u> v. <u>Barnhart</u>, 99 Civ. 1355, 2003 WL 1877228 at *7-11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); <u>Alvarez</u> v. <u>Barnhart</u>, 02 Civ. 3121, 2002 WL 31663570 at *5-7 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior decisions), <u>report & rec. adopted</u>, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

[5/]    <u>See also, e.g.</u>, Shaw v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Curry</u> v. <u>Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Balsamo</u>
(continued...)

The combined effect of all impairments must be of such severity that the person

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see, e.g., Barnhart v. Thomas, 540 U.S. at 23, 124 S. Ct. at 379; Barnhart v. Walton, 535 U.S. at 218, 122 S. Ct. at 1270; Butts v. Barnhart, 388 F.3d at 383; Draegert v. Barnhart, 311 F.3d at 472.[6]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); see, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Secretary of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).[7]

---

[5] (...continued)
v. Chater, 142 F.3d 75, 79 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Martinez v. Massanari, 242 F. Supp. 2d 372, 375 (S.D.N.Y. 2003); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *4 (S.D.N.Y. Jan. 7, 2003); Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002); Worthy v. Barnhart, 01 Civ. 7907, 2002 WL 31873463 at *4 (S.D.N.Y. Dec. 23, 2002); Perez v. Barnhart, 234 F. Supp. 2d 336, 339 (S.D.N.Y. 2002).

[6] See also, e.g., Shaw v. Chater, 221 F.3d at 131-32; Rosa v. Callahan, 168 F.3d at 77; Balsamo v. Chater, 142 F.3d at 79; Garcia v. Barnhart, 2003 WL 68040 at *4; Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

[7] See also, e.g., Rivas v. Barnhart, 01 Civ. 3672, 2005 WL 183139 at *16 (S.D.N.Y. Jan. 27, (continued...)

B.    **Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003); Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, No. 01-6247, 36 Fed. Appx. 670, 672, 2002 WL 1275339 at *2 (2d Cir. June 10, 2002), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 Fed. Appx. 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); 42 U.S.C. § 405(g).[8/]  "'Thus, the role of the district court is quite limited and substantial deference is to be

_____

[7/]    (...continued)
2005); Batista v. Commissioner of Soc. Sec., 03 Civ. 10121, 2004 WL 2700104 at *7 (S.D.N.Y. Nov. 23, 2004); Rebull v. Massanari, 240 F. Supp. 2d at 268; Worthy v. Barnhart, 2002 WL 31873463 at *4.

[8/]    See also, e.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *6 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Rodriguez v. Barnhart, 03 Civ. 7272, 2004 WL 1970141 at *8 (S.D.N.Y. Aug. 23, 2004), aff'd, 163 Fed. Appx. 15 (2d Cir. 2005); Martinez v. Massanari, 242 F. Supp. 2d 372, 375 (S.D.N.Y. 2003); Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *7 (S.D.N.Y. Jan. 13, 2003); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *3 (S.D.N.Y. Jan. 7, 2003); Rebull v. Massanari, 240 F. Supp. 2d 265, 268-69 (S.D.N.Y. 2002); Worthy v. Barnhart, 01 Civ. 7907, 2002 WL 31873463 at *3 (S.D.N.Y. Dec. 23, 2002); Norris v. Barnhart, 01 Civ. 0902, 2002 WL 31778794 at *3 (S.D.N.Y. Dec. 12, 2002); Morales v. Barnhart, 01 Civ. 4057, 2002 WL 31729526 at *6 (S.D.N.Y. Dec. 5, 2002)

afforded the Commissioner's decision.'" <u>Morris</u> v. <u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002).[9]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>, <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131; <u>Curry</u> v. <u>Apfel</u>, 209 F.3d at 122; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 61; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773-74; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46.[10] "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1212, 103 S. Ct. 1207 (1983). The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a <u>de</u> <u>novo</u> review.'"

---

[9]   See also, <u>e.g.</u>, <u>Duran</u> v. <u>Barnhart</u>, 2003 WL 103003 at *9; <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review.") (internal quotations & alterations omitted).

[10]   See also, <u>e.g.</u>, <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d at 106 (2d Cir. 2003); <u>Batitsta</u> v. <u>Commissioner of Soc. Sec.</u>, 03 Civ. 10121, 2004 WL 2700104 at *5 (S.D.N.Y. Nov. 23, 2004); <u>Rodriguez</u> v. <u>Barnhart</u>, 2004 WL 1970141 at *9; <u>Martinez</u> v. <u>Massanari</u>, 242 F. Supp. 2d at 375; <u>Duran</u> v. <u>Barnhart</u>, 2003 WL 103003 at *9; <u>Garcia</u> v. <u>Barnhart</u>, 2003 WL 68040 at *3; <u>Worthy</u> v. <u>Barnhart</u>, 2002 WL 31873463 at *3; <u>Norris</u> v. <u>Barnhart</u>, 2002 WL 31778794 at *3; <u>Morales</u> v. <u>Barnhart</u>, 2002 WL 31729526 at *6; <u>Soto</u> v. <u>Barnhart</u>, 01 Civ. 7905, 2002 WL 31729500 at *4 (S.D.N.Y. Dec. 4, 2002).

Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[11/]  However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'"  E.g., Duvergel v. Apfel, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000); see also, e.g., Tejada v. Apfel, 167 F.3d at 773 (citing cases); Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; see, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); Bowen v. Yuckert, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth

---

[11/]    See also, e.g., Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996); Rodriguez v. Barnhart, 2004 WL 1970141 at *9; Garcia v. Barnhart, 2003 WL 68040 at *3; Morales v. Barnhart, 2002 WL 31729526 at *6.

stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[12] accord, e.g., Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Curry v. Apfel, 209 F.3d at 122; Brown v. Apfel, 174 F.3d at 62; Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[13]

The claimant bears the burden of proof as to the first four steps; if the claimant meets the burden of proving that he cannot return to his past work, thereby establishing a prima facie case, the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[12]    Amendments to 20 C.F.R. 404.1520 became effective September 25, 2003. See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2. The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively. 20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156. The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairments, the SSA will assess the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work. See 68 Fed. Reg. 51156. The ALJ appropriately utilized the residual functional capacity assessment amendments in this case. (See R. 15-17.)

[13]    See also, e.g., Balsamo v. Chater, 142 F.3d at 79-80; Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Batitsta v. Commissionerr of Soc. Sec., 2004 WL 2700104 at *6; Rodriguez v. Barnhart, 2004 WL 1970141 at *9-10; Martinez v. Massanari, 242 F. Supp. 2d at 375-76; Garcia v. Barnhart, 2003 WL 68040 at *4; Worthy v. Barnhart, 2002 WL 31873463 at *4; Norris v. Barnhart, 2002 WL 31778794 at *3-4; Perez v. Barnhart, 234 F. Supp. 2d 336, 339 (S.D.N.Y. 2002); Soto v. Barnhart, 2002 WL 31729500 at *4-5.

can perform considering not only his medical capacity but also his age, education and training.  See, e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Curry v. Apfel, 209 F.3d at 122; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); Rodriguez v. Barnhart, 2004 WL 1970141 at *10.

**C.      The Treating Physician Rule**

The "treating physician's rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion. Specifically, the Commissioner's regulations provide that:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2); see, e.g., Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Kamerling v. Massanari, 295 F.3d 206, 209 n.5 (2d Cir. 2002); Jordan v. Barnhart, 29 Fed. Appx. 790, 792 (2d Cir. 2002).[14]

Further, the regulations specify that when controlling weight is not given a treating physician's opinion (because it is not "well supported" by other medical evidence), the Court should consider the following factors in determining the weight to be given such an opinion:  (1) the length

---

[14]      See also, e.g., Bond v. Social Sec. Admin., 20 Fed. Appx. 20, 21 (2d Cir. 2001); Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999); Clark v. Commissioner of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d 496, 503 (2d Cir. 1998); Martinez v. Massanari, 242 F. Supp. 2d 372, 376 (S.D.N.Y. 2003); Garcia v. Barnhart, 01 Civ. 8300, 2003 WL 68040 at *5 & n.4-5 (S.D.N.Y. Jan. 7, 2003).

of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other factors which may be significant. 20 C.F.R. § 404.1527(d)(2); see also, e.g., Shaw v. Chater, 221 F.3d at 134; Clark v. Commissioner, 143 F.3d at 118; Schaal v. Apfel, 134 F.3d at 503; Martinez v. Massanari, 242 F. Supp. 2d at 376; Garcia v. Barnhart, 2003 WL 68040 at *6; Rebull v. Massanari, 240 F. Supp. 2d 265, 268 (S.D.N.Y. 2002).

The Commissioner's "treating physician" regulations were approved by the Second Circuit in Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

## II.    **PAPP'S ENTITLEMENT TO DISABILITY INSURANCE BENEFITS**

To be eligible for disability insurance benefits, an applicant must be "insured for disability insurance benefits." 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1); see, e.g., Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989); Velez v. Barnhart, 03 Civ. 0778, 2004 WL 1464048 at *3 (S.D.N.Y. May 28, 2004). "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage' to total quarters. 42 U.S.C. § 423(c)(1)(B); 20 C.F.R. §§ 404.101(a), 404.130-404.133." Arnone v. Bowen, 882 F.2d at 37; Velez v. Barnhart, 2004 WL 1464048 at *3. "'Quarters of coverage' include quarters in which the applicant earned certain amounts of wages or self-employment income. 20 C.F.R. §§ 404.101(b), 404.140-404.146." Arnone v. Bowen, 882 F.2d at 37; Velez v. Barnhart, 2004 WL 1464048 at *3. Papp would be insured in a particular quarter only if she had accumulated twenty "quarters of coverage" over the course of a forty quarter period ending

with that particular quarter. 42 U.S.C. § 423(c)(1)(B); 20 C.F.R. 404.130(b); <u>Arnone</u> v. <u>Bowen</u>, 882 F.2d at 37; <u>Velez</u> v. <u>Barnhart</u>, 2004 WL 1464048 at *3.

It is uncontested that Papp last met the 20/40 earnings requirement maintaining her "insured status" on June 30, 2001. (R. 15-16, 69-70, 151; Dkt. No. 12: Comm'r Br. at 2, 10; Dkt. No. 14: Papp Br. at 1 & n.1.)

Despite her failure to satisfy the earnings requirement at the time of her March 29, 2002 application, Papp might nevertheless have been insured for disability at that time if she qualified for a "period of disability." 42 U.S.C. § 416(i)(2)(A); 20 C.F.R. §§ 404.315, 404.320. The Federal Regulations state that:

> A period of disability is a continuous period of time during which you are disabled. If you become disabled, you may apply to have our records show how long your disability lasts. You may do this even if you do not qualify for disability benefits. If we establish a period of disability for you, the months in that period of time will not be counted in figuring your average earnings. If benefits payable on your earnings record would be denied or reduced because of a period of disability, the period of disability will not be taken into consideration.

20 C.F.R. § 404.320(a). This provision could operate to exclude from the relevant calculation the months in which Papp did not work. <u>See</u> <u>Arnone</u> v. <u>Bowen</u>, 882 F.2d at 38. If eligible for a "period of disability," Papp might have maintained her "insured status" until or past March 29, 2002, when she applied for benefits. <u>See</u> <u>Arnone</u> v. <u>Bowen</u>, 882 F.2d at 38.

"A 'period of disability' can only commence, however, while an applicant is 'fully insured.'" <u>Arnone</u> v. <u>Bowen</u>, 882 F.2d at 38; <u>see also</u> <u>Velez</u> v. <u>Barnhart</u>, 2004 WL 1464048 at *3. The parties here agree that Papp's date last insured was June 30, 2001. Thus, Papp can only be entitled to a "period of disability" if her continuous disability began before that date. 20 C.F.R.

§ 404.320(b)(2); see Arnone v. Bowen, 882 F.2d at 38. In other words, regardless of the seriousness of her present disability, unless Papp became disabled before June 30, 2001, she cannot be entitled to benefits. Arnone v. Bowen, 882 F.2d at 38.[15/]

## III.    APPLICATION OF THE FIVE STEP SEQUENCE TO PAPP'S CLAIMS

The Court must determine if the Commissioner's decision that Papp was not disabled during the relevant period from January 1, 2001 (the alleged onset date) through June 30, 2001 (the date last insured), was supported by substantial evidence.

### A.    Papp Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Papp was engaged in substantial gainful activity after her application for disability insurance benefits. "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended)

---

[15/]    See, e.g., Salvaggio v. Apfel, 23 Fed. Appx. 49, 50-51 (2d Cir. 2001) (benefits properly denied where multiple sclerosis sufferer could not provide medical evidence showing that she was under a disability prior to the date her insured status expired); Velez v. Barnhart, 2004 WL 1464048 at *4 (application for benefits correctly denied where plaintiff could not show that he was under a disability prior to his last insured date); Keller v. Barnhart, 01 Civ. 4334, 2002 WL 31778867 at *3 (S.D.N.Y. Dec. 12, 2002) (same); Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *12-13 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.) (same); Kocaj v. Apfel, 97 Civ. 5049, 1999 WL 461776 at *6 (S.D.N.Y. July 6, 1999) (application properly denied where plaintiff was severely disabled as of May 1, 1997 but could not demonstrate that she was under a disability prior to her last insured date of September 30, 1995).

for pay or profit." 20 C.F.R. § 404.1510.[16/]  The ALJ's conclusion that Papp was not engaged in substantial gainful activity during the applicable time period is not disputed.

### B. Papp Demonstrated Severe Mental Impairments That Significantly Limited Her Ability To Do Basic Work Activities

The next step of the analysis is to determine whether Papp proved that she had a severe physical or mental impairment or combination of impairments that "significantly limit[ed] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a). The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "Basic work activities" include:

> . . . walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking. . . .[u]nderstanding, carrying out, and remembering simple instructions. . . .[u]se of judgment. . . .[r]esponding appropriately to supervision, co-workers and usual work situations.

---

[16/]    See, e.g., Feliciano v. Barnhart, 04 Civ. 9554, 2005 WL 1693835 at *10 (S.D.N.Y. July 21, 2005) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *9-12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *10 (S.D.N.Y. July 8, 2003) (Peck, M.J.); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *11 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

20 C.F.R. § 404.1521(b)(1)-(5).[17/]  The Second Circuit has warned that the step two analysis may not do more than "screen out <u>de minimis</u> claims."  <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1030 (2d Cir. 1995).[18/]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process." <u>Rosario</u> v. <u>Apfel</u>, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 13, 1999) (citing 20 C.F.R. § 404.1520(C)); <u>accord</u>, <u>e.g.</u>, <u>Rodriguez</u> v. <u>Barnhart</u>, 2005 WL 643190 at *10; <u>Jiang</u> v. <u>Barnhart</u>, 2003 WL 21526937 at *10.  On the other hand, if the disability claim rises above the <u>de minimis</u> level, then the further analysis of step three and beyond must be undertaken. <u>See</u>, <u>e.g.</u>, <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d at 1030.[19/]

---

[17/]   <u>See also</u>, <u>e.g.</u>, <u>Feliciano</u> v. <u>Barnhart</u>, 04 Civ. 9554, 2005 WL 1693835 at *11 (S.D.N.Y. July 21, 2005) (Peck, M.J.); <u>Rodriguez</u> v. <u>Barnhart</u>, 04 Civ. 4514, 2005 WL 643190 at *10 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); <u>De Roman</u> v. <u>Barnhart</u>, 03 Civ. 6372, 2003 WL 21511160 at *11 (S.D.N.Y. Nov. 14, 2003) (Peck, M.J.); <u>Acosta</u> v. <u>Barnhart</u>, 99 Civ. 1355, 2003 WL 1877228 at *11 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); <u>Alvarez v. Barnhardt</u>, 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Apr. 10, 2002) (Peck, M.J.) (citing my prior decisions), <u>report and rec. adopted</u>, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

[18/]   <u>Accord</u>, <u>e.g.</u>, <u>Feliciano</u> v. <u>Barnhart</u>, 2005 WL 1693835 at *11; <u>Rodriguez</u> v. <u>Barnhart</u>, 2005 WL 643190 at *10; <u>Jiang</u> v. <u>Barnhart</u>, 03 Civ. 0077, 2003 WL 21526937 at *10 (S.D.N.Y. July 8, 2003) (Peck, M.J.); <u>De Roman</u> v. <u>Barnhart</u>, 2003 WL 21511160 at *11; <u>Acosta</u> v. <u>Barnhart</u>, 2003 WL 1877228 at *11; <u>Alvarez v. Barnhardt</u>, 2002 WL 31663570 at *9.

[19/]   <u>See also</u>, <u>e.g.</u>, <u>Feliciano</u> v. <u>Barnhart</u>, 2005 WL 1693835 at *11; <u>Rodriguez</u> v. <u>Barnhart</u>, 2005 WL 643190 at *10; <u>Jiang</u> v. <u>Barnhart</u>, 2003 WL 21526937 at *10; <u>De Roman</u> v. <u>Barnhart</u>, 2003 WL 21511160 at *11; <u>Acosta</u> v. <u>Barnhart</u>, 2003 WL 1877228 at *12; <u>Alvarez v. Barnhardt</u>, 2002 WL 31663570 at *9.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

The ALJ found that "[t]he claimant's bipolar disorder is a 'severe' impairment, based upon the requirements in the Regulations." (R. 23.) This finding is not disputed.

### C.     Papp Did Not Have A Disability Listed in Appendix 1 of the Regulations

The third step of the five-part test requires a determination of whether Papp had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).[20/]

The ALJ found that although Papp's bipolar disorder was "severe," "[t]he medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (R. 23.) Appendix 1 provides a categorization of

---

[20/]     Accord, e.g., Feliciano v. Barnhart, 04 Civ. 9554, 2005 WL 1693835 at *11 (S.D.N.Y. July 21, 2005) (Peck, M.J.); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *10 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *11 (S.D.N.Y. July 8, 2003) (Peck, M.J.); De Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *12 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *13 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.); Alvarez v. Barnhardt, 02 Civ. 3121, 2002 WL 31663570 at *9 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003) (Martin, D.J.).

physical and mental impairments. 20 C.F.R., Pt. 404, Subpt. P, App. 1. Papp's mental impairment diagnoses were bipolar disorder and severe depression. (See pages 4-14 above).

Papp claims that she is per se disabled based on the impairments listed in Appendix 1 under "Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R., Pt. 404, Subpart. P. App. 1, §12.04. (See Papp Br. at 13-15.) In order to qualify for this category, either both § 12.04(A) and § 12.04(B) must be satisfied, or § 12.04(C) alone must be satisfied. § 12.04. Utilizing Dr. Saltiel's diagnosis of bipolar disorder, to satisfy this subsection there must be "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." 20 C.F.R., Pt. 404, Subpart. P, App. 1, § 12.04(A)(3). Utilizing Dr. Saltiel's and Dr. Eshkenazi's diagnosis of severe depression, at least four of the following criteria must be met to satisfy this subsection:

a. Anhedonia or pervasive loss of interest in almost all activities; or
b. Appetite disturbance with change in weight; or
c. Sleep disturbance; or
d. Psychomotor agitation or retardation; or
e. decreased energy; or
f. feelings of guilt or worthlessness; or
g. Difficulty concentrating or thinking; or
h. thoughts of suicide; or
i. Hallucinations, delusions, or paranoid thinking.

20 C.F.R., Pt. 404, Subpart. P App. 1, §12.04(A)(1). The record contains evidence that Papp had at least four of the above listed criteria prior to Papp's last insured date of June 30, 2001: anhedonia or pervasive loss of interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, difficulty concentrating or thinking, and thoughts of suicide. (R. 113.) Thus, for

present analysis, whether under the depression or bipolar disorder diagnosis, Papp satisfied § 12.04(A).

To satisfy § 12.04(B), however, Papp must demonstrate at least two of the following criteria: "1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." §12.04(B). The record does not contain any medical evidence demonstrating that Papp met any of these criteria before her last insured date of June 30, 2001. Indeed, her treating psychiatrist, Dr. Saltiel, noted that Papp was "doing well" during her March and April 2001 visits to him. (R. 114.)

The reports that Dr. Saltiel prepared on July 15, 2002 and June 25, 2003 describe Papp's symptoms as of those dates, which are well after Papp's June 30, 2001 last insured date, and therefore they are irrelevant to this analysis. See, e.g., Dailey v. Barnhart, 277 F. Supp. 2d 226, 233 n.14 (W.D.N.Y. 2003) ("Medical opinions given after the date that [the claimant's] insured status expired are taken into consideration if such opinions are relevant to her condition prior to that date.") (emphasis added); see also, e.g., Dominick v. Bowen, 861 F.2d 1330, 1333 (5th Cir. 1988) (SSA properly disregarded evidence of post-insured status mental disorders); Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *12-13 (S.D.N.Y. Apr. 10, 2003) (Peck, M.J.) (although medical reports from June 1998 definitively showed that claimant was disabled, those reports did not show that claimant was disabled prior to his last insured date of December 31, 1995). However, even if the Court were to take those reports into consideration, they do not demonstrate that Papp met at least two of the § 12.04(B) criteria. Dr. Saltiel's July 15, 2002 report described Papp as "markedly

limited" in only two activities: the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. 101-03.) This satisfies only § 12.04(B)(3). Dr. Saltiel's June 25, 2003 report also described Papp as "markedly limited" in two activities: the ability to carry out detailed instructions, and the ability to accept instructions and respond appropriately to criticism from supervisors. (R. 127-29.) Again, this satisfies only § 12.04(B)(3). Thus, even if these specific findings from 2002 and 2003 could be considered as to whether Papp was "markedly limited" in at least two of the general categories outlined in § 12.04(B) prior to June 30, 2001, they do not show such marked limitations.

While consulting psychiatrist Dr. Eshkenazi's October 26, 2004 report found that Papp was "markedly limited" in nine activities (R. 145-47), and claims that the earliest date to which the limitations applied was 1999 (R. 149), Papp's heavy emphasis on this report is misplaced. (See Papp Br. at 13-15.) Dr. Eshkenazi was not Papp's treating physician, and as a consultant only examined Papp once, on October 24, 2004, more than three years after Papp's last insured date. (R. 139-49.) Because he was Papp's treating physician during the period in question, Dr. Saltiel's notes and reports are entitled to more weight than those of Dr. Eshenazi. (See cases cited on pages 23-24 above and page 37 below.)

As an alternative to §§ 12.04(A) and 12.04(B), Papp could qualify under Appendix 1 if she satisfied the requirements of § 12.04(C) alone. The requirements of § 12.04(C) are:

C.     Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.     Repeated episodes of decompensation, each of extended duration; or

2.     A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.     Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R., Pt. 404, Subpart. P App. 1, §12.04(C).  The record, however, does not contain any medical evidence demonstrating that Papp met any of these criteria before her last insured date of June 30, 2001.  Indeed, the record shows only two incidents of "decompensation" in 1997 and 1999, with no indication of duration.  (<u>See</u> pages 5, 10 above.)

The Court finds that the ALJ's decision that Papp did not satisfy any Appendix 1 listing is supported by substantial evidence.

**D.     <u>Papp Had the Ability to Perform Her Past Work</u>**

The fourth prong of the five part analysis is whether Papp had the residual functional capacity to perform her past relevant work, that is, her work as a receptionist or file clerk.  (<u>See</u> pages 2-4 above.)  Given the medical evidence that did not indicate that Papp had any limits in her ability to perform her former work-related activities prior to her last insured date of June 30, 2001, the ALJ correctly concluded that Papp was capable of resuming her former employment.  (R. 22-23.)

Because Papp did not meet her burden of proof on the fourth step of the analysis, the Court is not required to advance to the fifth step.  See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step."); Rodriguez v. Barnhart, 04 Civ. 4514, 2005 WL 643190 at *12 (S.D.N.Y. Mar. 21, 2005) (Peck, M.J.); Jiang v. Barnhart, 03 Civ. 0077, 2003 WL 21526937 at *15 (S.D.N.Y. July 8, 2003) (Peck, M.J.); Walzer v. Chater, 93 Civ. 6240, 1995 WL 791963 at *11 (S.D.N.Y. Sept. 26, 1995) (Kaplan, D.J. & Peck, M.J.) (citing Rivera v. Schweiker, 717 F.2d 719, 722 (2d Cir. 1983); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982); & Velk v. Shalala, 93 Civ. 3111, 1995 WL 217516 at *5 (S.D.N.Y. April 11, 1995)).

### E.      The ALJ Did Not Ignore the Treating Physician's Evidence

Papp claims that the Commissioner ignored the "treating physician" rule.  (Dkt. No. 14: Papp Br. at 15-19.)  The Court disagrees.

The major problem with Papp's claim is that while her internist, Dr. Lebowitz, opined in January 2003 that "[d]uring these past twelve years, [Papp's] primary and recurring problem has been severe depression" (R. 109), he gave no basis for his conclusion and, apparently, did not refer Papp to a psychiatrist until October-November 2000.  (R. 20; see page 4 above.)  The ALJ's determination to give no weight to Dr. Lebowitz's ipse dixit after the fact opinion was not erroneous. See, e.g., Ratcliff v. Barnhart, 92 Fed. Appx. 838, 840 (2d Cir. 2004) ("Although the ALJ is normally obligated to give the treating physician's opinion controlling weight, where that opinion is not supported by medical evidence or is contradicted by other substantial evidence in the record, the ALJ is entitled to use discretion in weighing the medical evidence as a whole."); Taylor v. Barnhart, 83

Fed. Appx. 347, 349 (2d Cir. 2003) (same); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002) ("While the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record.") (citations omitted); <u>see also</u>, <u>e.g.</u>, <u>Feliciano</u> v. <u>Banhart</u>, 04 Civ. 9554, 2005 WL 1693835 at *15 (S.D.N.Y. July 21, 2005) (Peck, M.J.) ("Court gives more weight to the treating psychiatrist's opinion as to [the claimant's] mental health than Dr. Tejwani, who is an internal medicine practitioner.").

For the period before June 30, 2001, Papp's date last insured, the contemporaneous records of Dr. Saltiel, Papp's treating psychiatrist, show that while Papp was depressed, she was "doing well" on her medications.  (<u>See</u> page 5 above.)  Dr. Saltiel's treating notes from that key period provide substantial evidence to support the ALJ's conclusion that Papp was not disabled. Dr. Saltiel's later reports, in July-August 2002 and in 2003, specifically stated that they applied to Papp's then "present" condition (<u>see</u> pages 7-9, 11-12 above), and thus do not provide evidence as to her condition in the January-June 2001 period.  <u>See</u>, <u>e.g.</u>, <u>Ratcliff</u> v. <u>Barnhart</u>, 92 Fed. Appx. at 840 (treating doctor's opinion in 1997, "based solely on [claimant's] representations rather than Dr. Adelson's first-hand observations . . . provides no evidence as to [claimant's] condition in 1991," and thus "the ALJ was correct in not giving Adelson's opinion controlling weight."); <u>Salvaggio</u> v. <u>Apfel</u>, 23 Fed. Appx. 49, 50-51 (2d Cir. 2001) ("Our independent review of the record reveals that the plaintiff did suffer from multiple sclerosis beginning as early as 1989.  However, we find substantial evidence supporting the ALJ's finding that prior to 1989 the nature of the plaintiff's symptoms cannot be established from independent sources.  We conclude that this lack of

independent medical evidence, the result of the plaintiff's choice to seek only minimal medical attention for her symptoms prior to 1989, supports the finding that the plaintiff was not under a disability as defined by the Social Security Act at any time prior to the time her insured status expired."); Velez v. Barnhart, 03 Civ. 0778, 2004 WL 1464048 at *4 (S.D.N.Y. May 28, 2004) ("while the evidence of medical treatment received by [claimant] after [his last date insured] 'is not irrelevant' to a determination of disability prior to that date, there is no evidence that [claimant's] condition was as severe prior to [his last date insured] as it was at the time of such treatment . . . Even if some or all of [claimant's] conditions did accrue on or before [his date last insured], however, the evidence is insufficient to show that those conditions rose to the level of a 'disability,' as defined by the Act.") (citations omitted); Acosta v. Barnhart, 99 Civ. 1355, 2003 WL 1877228 at *12 (Apr. 10, 2003) (Peck, M.J.) ("While Dr. Bellini diagnosed [claimant] as having 'low back pain' and 'anxiety disorder' (SR. 200-03), he did not opine as to whether [claimant] was disabled as of that date, nor did he provide any opinion or medical evidence that [claimant] was disabled as of December 1995, his last insured date. Thus, [claimant] failed to show the existence of a disability since he presented no medical evidence as to his condition during the pre-May 1996 period.") (citing cases); Keller v. Barnhart, 01 Civ. 4334, 2002 WL 31778867 at *3 (S.D.N.Y. Dec. 12, 2002) (Claimant "has not sustained his burden of showing that he was disabled prior to December 31, 1989, the date he was last insured for disability insurance benefits. Although the medical evidence of record shows that [claimant] may currently have severe impairments, this evidence post-dates [claimant's] last insured date by approximately ten years. There is no evidence regarding treatment from January 1, 1987 to December 31, 1989. . . . The ALJ properly decided that [claimant] failed to

establish the existence of a severe impairment during the relevant period."). Moreover, as the ALJ discussed at length (R. 17-22), there were inconsistencies between Dr. Saltiel's contemporaneous treatment notes and his later opinion.

Finally, while Dr. Eshkenazi opined that Papp was disabled as of 1999, Dr. Eshkenazi was a consulting psychiatrist hired by Papp's counsel after the ALJ's adverse decision, and not a treating physician. (See page 12 above.) The treating physician rule does not apply to consulting doctors like Dr. Eshkenazi. E.g., Jones v. Shalala, 900 F. Supp. 663, 669 (S.D.N.Y. 1995); Fuller v. Shalala, 898 F. Supp. 212, 217 (S.D.N.Y. 1995).

Thus, the Commissioner did not violate the treating physician rule in concluding that Papp was not disabled between January 1, 2001 and June 30, 2001.

### CONCLUSION

For the reasons set forth above, the Commissioner's determination that Papp was not disabled within the meaning of the Social Security Act is supported by substantial evidence, the Commissioner's motion for judgment on the pleadings is GRANTED and Papp's cross-motion for judgment on the pleadings is DENIED.

DATED:     New York, New York
           April 18, 2006

_____

**Andrew J. Peck**
United States Magistrate Judge

Copies to:    Charles E. Binder, Esq.
              John E. Gura, Jr., Esq.